JOHN CADWALADER vs. HENRY A. PRICE.

*Ejectment—Description in Deed—Admissibility of Hearsay Evidence to Prove Boundaries of Land—Adverse Possession—Warrant of Resurvey.*

A deed purporting to convey "that part of a tract of land called King's Hill situate in Gunpowder Neck, in Harford County, known as the landing on King's creek," contains a sufficient description by reference, if the location can be proved.

The evidence in this case does prove the location, and in an action of ejectment this deed is competent evidence to show color of title in aid of the defense of adverse possession.

Evidence of the declarations of a former owner of land, now deceased, is admissible to prove the boundaries of the land, if there was no controversy as to the boundaries at the time the declarations were made.

After the owner of a parcel of land called "the landing at the head of King's creek" had conveyed the same he went upon the tract and pointed out its boundaries. In an action of ejectment, after the death of this former owner, evidence of these declarations, although hearsay, is admissible to show the boundaries of the land.

Such evidence is not prohibited by the rule that a vendor cannot impair the rights of his vendee after he has parted with the land.

In an action of ejectment to recover a parcel of land used as a landing on a creek, the evidence is held to be sufficient to show that the defendant had acquired title by adverse possession, after entry under a deed which gave color of title.

When one has been in possession of land in such a way and for such length of time as to make out a case of adverse possession, a grant of the land is presumed, and this presumption is not rebutted by the fact that the jury may find that no grant was ever actually made.

When the defendant in an action of ejectment claims title by
adverse possession to only a part of the land in question, a
survey of it ought to be made under a warrant issued by the
Court.

*Decided June 1st, 1909.*

Appeal from the Superior Court of Baltimore City (HAR-
LAN, C. J.).

The cause was argued before BOYD, C. J., BRISCOE,
PEARCE, SCHMUCKER, BURKE, THOMAS, WORTHINGTON and
HENRY, JJ.

*Horace S. Whitman* and *Thos. F. Cadwalader,* for the ap-
pellant.

*John S. Young* and *S. S. Field,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in favor of
the defendant (appellee) in an action of ejectment instituted
in Harford County and removed for trial to the Superior
Court of Baltimore City. The land sued for is described in
the declaration by courses and distances, and contains one-
half acre, more or less. A plea of not guilty was entered
short on the docket, but defence on warrant was not taken.

Thomas Dorney, by his last will and testament, which was
probated February 6th, 1844, devised to Jackson Dorney, his
son, a plantation called "King's Hill," and a tract called
"Savory's Farm." By deed dated September 10th, 1852,
Jackson Dorney and wife conveyed to George Hartman all
that tract known by the name of "King's Hill," "excepting
and reserving to him the said Jackson Dorney and his heirs
and assigns forever the landing and the free use and privilege
of the same situated at the head of King's Creek, with the
right of way to and from the same through, along and over the

said land hereby conveyed at and along such convenient road or way as may be deemed reasonable and proper to approach the said landing." On March 24, 1856, George Hartman conveyed to Thomas J. Cochran all that part of a tract or parcel of land called "King's Hill" contained within the metes and bounds, courses and distances therein set forth, "being the same lands described in a deed from Jackson Dorney and wife to George Hartman * * * and subject to the exceptions and reservations therein made." Thomas J. Cochran and wife conveyed by deed dated December 5, 1864, to General George Cadwalader two tracts, including that conveyed by the last-mentioned deed, "except and subject to the landing and right of way reserved in and by the deed for the same lands from Jackson Dorney to George Hartman dated," etc. It is admitted that the plaintiff became entitled to all the property conveyed to George Cadwalader by the deeds in evidence.

The real controversy in the case arises from the exception and reservation in the deed from Jackson Dorney and wife to George Hartman above set out, but involved in it is a deed from Jackson Dorney and wife to John Price, father of the defendant, and Salathiel Legoe, dated September 11th, 1860, which was admitted by the Court below. That deed grants "all that part of a tract of land called 'King's Hill' situate in Gunpowder Neck in Harford County, known as the landing on King's Creek, which was excepted and reserved by us, the said Jackson Dorney and Hannah J., his wife, in a deed from us * * * to George Hartman * * *, together with the right of way to and from said landing and all other rights, privileges and immunities reserved by us," etc. The record shows that four-sixths' interest in whatever property was thereby conveyed was in the defendant, and that the remaining two-sixths were vested in one of the heirs of said Legoe, and in William T. Price. The appellant claims under the deed to Hartman, and the appellee under the exception and reservation, and also by adverse possession,

as well as through the deed to John Price and Salathiel Legoe.

Although a number of prayers were granted, at the instance of both sides, no exceptions were taken to the rulings on the prayers, but there are ten bills of exception presenting rulings as to the evidence. The first and third can be considered together. The first was to the admission of the deed from Dorney to Price and Legoe above referred to, and the third was to over-ruling a motion to exclude that deed, which was made at the end of the case. Without discussing other grounds for its admissibility, we are of the opinion that it was admissible to show color of title. It grants "all that part of a tract of land called 'King's Hill' situate in Gunpowder Neck in Harford County, known as the landing on King's Creek," etc There is abundant evidence to show that there was a parcel of land known as "King's Creek Landing" by some, and as the "Landing on King's Creek" by other witnesses. William F. Stevens testified he had known King's Creek Landing thirty or thirty-five years, although he did not know the boundaries until Jackson Dorney pointed them out in 1883, the effect of which we will consider later. Martin Gallion, who was fifty-one years of age, testified he had known King's Creek Landing since he was about fifteen, but he did not know the boundaries until 1883. Boyd Preston said he had known King's Creek Landing for many years, but he did not seem to know the boundaries until Mr. Dorney pointed them out. John S. Price, who was forty-five years of age, had known "the landing on King's Creek" since he could remember. He spoke of two stones on the western boundary but the record is not clear that he knew the boundaries before 1883. Daniel Sullivan, who lived on the Savory Farm from 1861 to 1882 and then moved on King's Hill Farm, where he lived for three years, spoke of it as King's Creek Landing. Joseph A. Price, a brother of the defendant, testified that he was seventy-one years of age and had lived about six or seven miles from King's Creek Landing nearly all his life, that he

had known the landing at the head of King's Creek since 1850, had been on it before his father purchased it and it was called King's Creek Landing, that there was no other place, so far as he knew, that went by the name of King's Creek Landing or the landing on King's Creek, that he knew the stones referred to by the witnesses (claimed to be the western boundary) long before his father purchased the property, remembers having seen them as early as early as 1852 and saw them from time to time until 1888; that when he first went there, Jackson Dorney was in possession of King's Creek Landing and that his father paid taxes to him on King's Creek Landing while he was tax collector in 1884, 1885, 1886, 1887 and 1888. He also said that the road to the landing was not in the same place that it now is, but was changed about 1864 when Mr. Cochran owned King's Creek farm and had been in the same place ever since.

W. E. Somerville, county surveyor of Harford County, testified that he made the survey of King's Creek Landing shown on the plat filed in this case, that he fixed the western boundary by drawing a line from a point at the head of a marsh making up from King's Creek, pointed out as the place where a boundary stone formerly stood, near a gum tree, through another point near the bank of the southwestern branch of King's Creek, pointed out as the spot where formerly stood a boundary stone under a white oak tree and that the remaining boundaries of King's Creek Landing consist of following King's Creek around to the marsh first mentioned and up to the point of beginning. That is the description of King's Creek Landing as claimed by the defendant.

The parcel of land claimed by defendant as the landing is less than half an acre, and while most of the witnesses did not know the boundaries of it except as pointed out in 1883 by Jackson Dorney, there was unquestionable evidence tending to show that there was a parcel of land known as King's Creek Landing, or landing on King's Creek. If the location of it could be proved, the reference to it in this deed was sufficient. It is as definite as the description of land in the deed from

Dorney to Hartman, under which the plaintiff claims,—
"King's Hill." By sec. 22 of Art. 75 of the Code it is provid-
ed that: "It shall not be necessary to state the name by which
land may have been patented in declarations in actions of
ejectment, dower, trespass or case, but the same may be de-
scribed by abuttals, course and distance, by any name it may
have acquired by reputation, or by any other description cer-
tain enough to identfy the same." See also *Jay* v. *Michael,*
82 Md. 12; *Winter* v. *White,* 70 Md. 305, and *Huddleson* v.
*Reynolds,* 8 Gill, 332. In the latter case a tract patented as
"Western Route" was sometimes called "West Route." The
Court said "The conclusion seems to be warranted that the
tract which, when taken up, was called by the name of 'West-
ern Route' was in a later time sometimes called West, and
sometimes Western Route. If so, a conveyance by the name
which it had acquired by reputation would have passed the
title to the patented tract." It would seem clear, therefore,
that the deed on its face was admissible, and it only remains
in that connection to determine whether the evidence suffi-
ciently shows that there was such a tract, capable of definite
location. In addition to the evidence we have already re-
ferred to, we will now consider the fourth bill of exceptions,
which presents for review the action of the lower Court in
overruling the motion to strike out the testimony of the
witnesses in reference to the declarations and acts of Jackson
Dorney.

He went upon the land in 1883 and pointed out to a num-
ber of persons, who were witnesses in this case, the lines of
King's Creek Landing—telling them that a line between two
stones which were then there (and the places where they stood
were located on the plat by the surveyor) was the western
boundary, and a marsh from the north stone to King's Creek
was the northern boundary and King's Creek was the east-
ern and southern boundaries. There ought no longer to be
any question in Maryland about the right to prove private
boundaries by the declarations of deceased persons, subject,
of course, to certain well recognized limitations. If such

evidence were excluded, on the ground that it was hearsay, it would be impossible, in portions of the State where there is still controversy over boundary lines, to establish the corners and lines of ancient tracts. It is said in *Dorsey on Ejectment,* 57-58: "It may be asked, how can a witness be called to identify a boundary made in 1680? The law does not require this. It is generally true that hearsay is not evidence; yet from necessity there are certain exceptions. The enquiries of a jury are directed to identify a boundary, and it may be proved by traditional evidence. The rules of evidence permit a witness to refer to the *declarations of a deceased* person who was on the survey. As in consanguinity, so boundaries may be proved by hearsay evidence; but the *declarations of living witnesses* cannot be received, nor the declarations of a person interested in establishing the fact."

It was held by the Provincial Court in *Howell* v. *Tilden,* 1 H. & McH. 84 that: "Traditional evidence of what an ancestor of the plaintiff, who was seised of the lands in question fifty years ago, at that time did say concerning the bounds of those lands, might be given in evidence to the jury, and the weight of it left to the jury." *Redding* v. *McCubbin,* 1 H. & McH. 368, is to same effect. In *Ridgely* v. *Ogle,* 4 H. & McH. 123, it was held that: "A plat returned in an ancient ejectment is admissible in evidence upon the same principle that hearsay evidence is allowed to prove boundaries." See also *Scott* v. *Ollabaugh,* 3 H. & McH. 511, and *Snavely* v. *McPherson,* 5 H. & J. 150. In *Hall* v. *Gittings,* 2 H. & J. 121, the declarations of a former holder of the adjoining lands as to the bounds of the land in dispute were held competent and admissible in evidence, it not appearing to the Court by the plots that he was interesed in establishing the truth of the facts related by him to the witnesses. See also *Bladen* v. *Cockey,* 1 H. & McH., 232; *Weems* v. *Disney,* 4 H. & McH. 156. Other cases might be cited, but they can be found either in the notes in *Dorsey on Ejectment* or in *Mr. Brantly's Annotated Edition* of the early cases. Although in the later decisions of this Court the question may not have

been passed on, it is because the rule has been too generally recognized to admit of controversy. An examination of the records in some of the later cases will doubtless show that such testimony has been received, and the writer of this opinion knows that in the many actions of ejectment and trespass *quare clausum fregit* which have arisen in Western Maryland it has been the unquestioned practice to prove boundaries by traditional evidence.

The general rule in this country is thus stated in 4 *Am. & Eng. Ency. of L.* 851: "Declarations of deceased persons are admissible in evidence in questions relating both to public and private boundary lines,. provided they were made *ante litem motam* and by a person who had peculiar means of information, and who had no interest in the matter at issue at the time they were made." In 5 *Cyc.,* 956, it said: "Hearsay evidence as to boundaries is admissible when there has been so great a lapse of time as to render it difficult to prove the original boundary lines by the existence of the primitive landmarks," and on page 957, "Reputation or tradition is very generally held to be admissible in evidence to prove an ancient boundary, whether public or private, although in England and a few of the United States its admissibility to prove a private boundary is limited to cases where it is shown that such boundary is co-incident with a public or quasi-public one. Such reputation or tradition must, however, be ascertained as to the subject-matter as direct evidence would be, and is not admissible to contradict evidence of record; and in all cases proof of ancient boundaries by common reputation must have reference to a time *ante litem motam.*"

In this case the declarations of Jackson Dorney were made at a time he had no interest in making them; before any controversy about the land in question had arisen, when he was pointing out the boundaries and he had died some years before the trial. He was the former owner and occupant of the farm and landing and hence was familiar with the facts. It is said, however, by the appellant that the evidence as to

Dorney's declarations and acts comes within the prohibition that a vendor of land cannot impair the rights of a vendee after he has parted with the property. But he was not only vendor of the farm but also of the landing. If he had been still living at the time of the trial there could have been no question about the right of the defendant to call him as a witness to show that the landing on King's Creek was a well defined tract of land, and to point out the boundaries. It is not an attempt to impeach the deed to Hartman, but that deed itself expressly excepted from its effect the landing situated at the head of King's Creek, and the question which became material at the trial, as is well shown by the plaintiff's prayer A, as modified, and by the defendant's third prayer, as modified, was whether there was a parcel of land answering that description, "with boundaries on all sides either well known or capable of definite location by visible objects." The construction of the deed was for the Court and the lower Court did construe it. If that construction was not satisfactory to the appellant he should have brought the rulings of the lower Court here for review, but as we have seen there are no exceptions to the prayers in the record. If the Court was right in its construction of the deed, then it was necessary to submit to the jury the question of fact whether there was such a definite tract. In order to determine that, it was admissible to prove the boundaries, and in doing so it was competent to prove that Dorney had pointed them out to the witnesses who were called at the trial.

It is not necessary to determine whether it was admissible to offer such statements as "that is what he reserved," and similar declarations which some of the witnesses testified he used, for the motion to exclude was not confined to them, but we can see no reason why Jackson Dorney could not, at the time he did, point out the corners and lines of the parcel of land known as the lading. According to the evidence of Joseph A. Price the stones were there at least as early as October or November, 1852—only a month or two after the deed from Dorney to Hartman—and he had known the land-

ing at the head of King's Creek since 1850. That there was some kind of landing there is shown by the deed to Hartman.

With this and other testimony in the record, there was ample evidence tending to show that there was a well defined parcel of land known as the lading on King's Creek, or as King's Creek landing, as most of the witnesses spoke of it, which was not only capable of being located but was in fact located by the county surveyor. The defendant testified that his father claimed to these lines and always paid the taxes on the landing until his death in 1893, and that he (the defendant) had paid them ever since. It might be said parenthetically, it is not probable that he was paying taxes on a mere easement.

The evidence is also ample to show adverse possession— under a deed which we have already said gave color of title. The father of the defendant and his co-tenant used the land for the purposes it was capable of being used and best adapted to. As early as 1870 Mr. Price built a shanty on it, he paid taxes on it, rented it for sometime and did all that could be required to show such acts of ownership as could be exercised over property of that character and locality. Then the record states: "Besides all the testimony set out in both the aforegoing bills of exception, which is by reference made a part hereof, further testimony was taken, and the defendant offered testimony *tending to prove adverse possession of the land* in controversy by defendant and those in privity with him and under whom he claims from the date of the deed from Dorney to Price and Legoe in 1860 down to the death of John Price, and down to the institution of this suit." In that connection we might add as a further answer to the argument of appellant that there was no evidence of any deed ever having been in existence, which had such a description as that relied on to show that the landing on King's Creek was a parcel of land known by that name, that when a party has had possession of property in such way and for such time as to make it adverse, within the meaning of the law, a deed is presumed, and "The presumption of a grant is an inference

of law arising out of a particular state of facts, and may exist although the jury, in their consciences may disbelieve the actual execution of such a grant." *Casey* v. *Inloes,* 1 Gill, 430. So if there had been any necessity for a deed prior to the one of 1860, which described the parcel of land, it could be presumed from the adverse possession.

We will not prolong this opinion by discussing the other questions raised. The brief of the appellant presents his theory of the case with marked ability, and contains an interesting review of the law on easements and other subjects, but the salient points in the case are those we have referred to.

We would add that in a case of this character there ought always to be a survey made under a warrant issued by the Court. No question was raised about the right of defendant to prove adverse possession because he had not taken defence on warrant, and we are therefore not called upon to pass on it. But when adverse possession is claimed of a part only of the lands sued for, that is unquestionably the proper practice. *Hackett* v. *Webster,* 97 Md. 405, and cases there cited. The record does not satisfactorily show whether the proper entry was made for the land for which there seems to have been a disclaimer, but that is not included in the exceptions before us. So far as we can determine from the exceptions in the record there is no ground for reversal, and the judgment must be affirmed.

> *Judgment affirmed, the appellant to pay the costs above and below.*